**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LVMH SWISS MANUFACTURES SA and HUBLOT SA, | Case No. 20-cv-07079 |
| Plaintiffs, | |
| v. | |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", | |
| Defendants. | |

**COMPLAINT**

Plaintiffs LVMH Swiss Manufactures SA and Hublot SA (together, "Plaintiffs") hereby bring the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and allege as follows:

**I. JURISDICTION AND VENUE**

1.      This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores[1] operating under the seller aliases identified in Schedule A attached hereto (the "Seller Aliases").  Specifically, Defendants have targeted sales

---

[1] The e-commerce store urls are listed on Schedule A hereto under the Online Marketplaces and Domain Names.

to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold products using infringing and counterfeit versions of Plaintiffs' trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II. INTRODUCTION

3.      Plaintiffs are subsidiaries of LVMH Moët Hennessy Louis Vuitton SA ("LVMH") and part of LVMH's Watches & Jewelry Business Group. This action has been filed by Plaintiffs to combat e-commerce store operators who trade upon Plaintiffs' reputations and goodwill by selling and/or offering for sale unauthorized and unlicensed products, including watches, using infringing and counterfeit versions of Plaintiffs' federally registered trademarks (the "Counterfeit Products"). Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale and selling Counterfeit Products to unsuspecting consumers. E-commerce stores operating under the Seller Aliases share unique identifiers establishing a logical relationship between them and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. Plaintiffs are forced to file this action to combat Defendants' counterfeiting of their registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. Plaintiffs have been and continue to be irreparably damaged through

consumer confusion, dilution, and tarnishment of their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

## III. THE PARTIES

**Plaintiffs**

**Plaintiff LVMH Swiss Manufactures SA**

4.      Plaintiff LVMH SWISS MANUFACTURES SA ("TAG Heuer") is organized and existing under the laws of Switzerland with its principal place of business in La Chaux de Fonds, Switzerland.

5.      Since 1860, watchmaking pioneer TAG Heuer has been blending technological innovations, high-precision timekeeping and cutting-edge designs to create products whose performance continues to shape the passing of time.  In 1887, TAG Heuer patented the famous "oscillating pinion" for mechanical stopwatches, which is still used to this day by leading manufacturers in production of mechanical chronographs.  From then on, TAG Heuer has continually been at the forefront of some of the most spectacular innovations in watchmaking history:  inventing the first stopwatch accurate to $1/100^{th}$ of a second, the first water resistant chronograph, the first chronograph movement with an automatic microrotor, among its numerous other accomplishments.

6.      TAG Heuer is engaged in the manufacture, sale and distribution of prestigious, high-quality, luxury, mechanical and electronic watches, and other similar items sold throughout the United States (collectively, the "TAG Heuer Products"), all of which prominently display its famous, internationally-recognized and federally-registered trademarks.  TAG Heuer Products have become enormously popular and even iconic, driven by TAG Heuer's arduous quality standards and innovative designs.  Indeed, TAG Heuer is the world's 4th largest prestigious

watch brand, having 1,600 employees around the world, 150 customer service centers, 5,200 collect points and 500 staff and master watchmasters worldwide, and whose products are sold in more than 4,300 boutiques. According to Vontobel Equity Research reports, TAG Heuer was ranked sixth of the Top 20 of Swiss watch brands by watch sales in 2012 (report dated May 31, 2013), seventh in 2013 (report dated May 6, 2014), and eighth in 2014 (report dated April 10, 2015), ahead of many other renowned watch brands.

7.     Among the purchasing public, genuine TAG Heuer Products are instantly recognizable as such. In the United States and around the world, the TAG Heuer brand has come to symbolize high quality, and TAG Heuer Products are among the most recognizable of their kind in the world. TAG Heuer Products have won several awards, and particularly, TAG Heuer Products have won almost every year at the prestigious Grand Prix D'Horlogerie De Genéve (Geneva Watchmaking Grand Prix). These awards are, notably, the following:

- Grand Prix D'Horlogerie De Genéve of 2002: "*Design Watch Prize*" for the Micrograph F1, accurate to 1/10 of a second;

- Grand Prix D'Horlogerie De Genéve of 2004: "*Design Watch Prize*" for the Monaco Sixty Nine watch;

- Grand Prix D'Horlogerie De Genéve of 2005: "*Design Watch Prize*" for the Diamond Fiction watch;

- 2005: "*Red Dot Design Award*" for the Monaco V4 watch;

- Grand Prix D'Horlogerie De Genéve of 2006: "*Sports Watch Prize*" for the TAG Heuer Carrera 360 pink gold watch;

- Grand Prix D'Horlogerie De Genéve of 2008: "*Sports Watch Prize*" for the TAG Heuer Grand Carrera Calibre 36 RS Caliper chronograph;

4

- Grand Prix D'Horlogerie De Genéve of 2010: "*Prize for the Small Hand*" for the TAG Heuer Carrera Calibre 1887 watch;

- Grand Prix D'Horlogerie De Genéve of 2011: "*Sports Chronograph Prize*" for the TAG Heuer Mikrotimer Flying 1000 watch;

- Grand Prix D'Horlogerie De Genéve of 2012: "*Golden Hand Prize*" for the MikroGirder chronograph, accurate to 5/10,000 of a second.

8.     The TAG Heuer website, tagheuer.com, provides visitors with a history of TAG Heuer, details of TAG Heuer Products, and the means by which TAG Heuer Products may be purchased around the world.  This website, on which the TAG Heuer trademark is clearly displayed, receives approximately 2 million visitors per month.

9.     TAG Heuer is also popular on social media platforms with over 3.3 million Facebook fans, over 400,000 followers on Twitter, and more than 2 million followers on Instagram.

10.     For over 150 years, TAG Heuer has embraced motor sports, by bringing together state-of-the-art materials, movements and avant garde design to produce the most precise, reliable and thrilling timepieces.  TAG Heuer launched the TAG Heuer Carrera in 1963, the first chronograph specifically designed for professional drivers.  TAG Heuer was the first watch brand to partner with racing drivers and the McLaren Formula One team, and is associated with the most famous drivers and time changers of the racing world:  Alain Prost, Ayrton Senna, Mikka Häkkinen, Lewis Hamilton, and Jenson Button.

11.     In addition to motor racing, TAG Heuer has partnered with six of the world's most iconic marathons, including the Chicago Marathon.  TAG Heuer was the official timekeeper of the 2015 Bank of America Chicago Marathon.

12. TAG Heuer's "Don't Crack Under Pressure" advertising campaign is inspired by TAG Heuer's image, popularity, and "unbreakable determination." The initial ads for this campaign featured celebrities and athletes such as Cristiano Ronaldo, Maria Sharapova, Steve McQueen, and Patrick Dempsey. The accompanying campaign film was awarded the 2014 Best Watchmaking Campaign at the annual Swiss Watchmaking Advertising Campaign Awards, recognized for its demonstration of the pioneering spirit, communication impact, and expression of the brand identity through the tight links that TAG Heuer has nourished with sports since 1860. This campaign has also included Cara Delevingne, the British super model with over 11.3 million followers on social media, as an ambassador.

13. TAG Heuer Products are distributed and sold to consumers through a network of carefully selected, authorized retailers that satisfy certain criteria, such as Jared, C.D. Peacock, and high-quality department stores throughout the United States and Illinois such as Macy's and Bloomingdale's. TAG Heuer guarantees the authenticity of, and provides a manufacturer's warranty for, merchandise purchased through authorized retailers of TAG Heuer Products, and only though those retailers.

14. TAG Heuer incorporates a variety of distinctive marks in the design of its various TAG Heuer Products. As a result of its long-standing use, TAG Heuer owns common law trademark rights in its trademarks. TAG Heuer has also registered its trademarks with the United States Patent and Trademark Office. TAG Heuer Products typically include at least one of TAG Heuer's registered trademarks. Often several TAG Heuer marks are displayed on a single product. TAG Heuer uses its trademarks in connection with the marketing of its TAG Heuer Products, including the following marks which are collectively referred to as the "TAG HEUER Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 2,281,436 | TAG HEUER | September 28, 1999 | For: Clocks, watches and parts thereof in class 014. |
| 5,202,283 | TAG HEUER | May 16, 2017 | For: soaps; perfumes; cosmetics, creams, and lotions for the body and hair; shampoos; makeup and makeup removers; lipstick; beauty masks; shaving preparations; after-shave lotions and balms; non-medicated toiletries; deodorants for personal use; leather polishes; preservative creams for leather in class 003.<br><br>For: apparatus for recording, transmission, reproduction, or processing of sound or images; electronic timers and timing sensors; calculating machines; equipment for data processing; timing dials and timing sensors; electronic timers; chronographs for use as specialized time recording apparatus; game software; computer operating software for smartwatches and mobile electronic devices; computer software for sending and receiving electronic mail, text messages, data, photographs, and videos; computer software for accessing, browsing, and searching online databases; computer software for sensing, monitoring, |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | recording, displaying, measuring, and transmitting global positioning, direction, distance, altitude, speed, navigational information, weather information, temperature, physical activity level, heart rate, pulse rate, blood pressure, calories burned, steps taken, and biometric data; computer software for tracking and managing information regarding health, fitness, and wellness programs; computer peripherals; telephones; tablet computers; MP3 players; smartwatches; wearable computers; smartphones featuring a watch; accessories for computers, telephones, tablet computers, MP3 players, and smartwatches, namely, displays, monitors, protective covers, carrying cases, stands, batteries, battery chargers, headphones, speakers, headsets, microphones, car audio adapters, remote controls, connection cables, power adapters, docking stations, and adapter plugs; spectacles; sunglasses; optical lenses and glasses; spectacle cases; memory cards and integrated circuit cards; downloadable electronic publications in the nature of books, newsletters, catalogs, and |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | brochures in the fields of watches, chronometric instruments, jewelry, apparel, luggage, leather accessories, personal care products, luxury goods, sports, and fashion; electronic sensors, monitors, and displays used to provide and display official time at sporting, cultural, wellness, entertainment, and educational events; electronic connected bracelets and connected cuffs for tracking the movement of people that also have a function of transmitting, and/or receiving data to and/or from personal digital assistants, tablets, smart phones and personal computers through internet websites and other computer and electronic communication networks in class 009.<br><br>For: jewelry; precious stones; horological instruments, namely, watches, wristwatches, and constitutive parts therefor; alarm clocks, clocks and other chronometric instruments, chronometers, chronographs as watches, chronometric apparatus for sports timing, chronometric apparatus for measuring and marking the time; watch |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | bands, watch chains, watch springs, watch dials or watch glasses, watch winders, watch cases being parts of watches, cases and boxes adapted for holding watches; precious metals and their alloys; jewelry cases; boxes of precious metal; key rings, trinkets or fobs of precious metals; cuff links; bracelets; rings; medals; watches that also have a function of transmitting and/or receiving data to and/or from personal digital assistants, tablets, smart phones and personal computers through internet websites and other computer and electronic communication networks; watches containing an electronic game function, watches incorporating a telecommunication function; leather boxes adapted for holding watches in class 014. For: passport holders and cases in class 016. For: goods of leather and imitation leather, namely, leather or leatherboard boxes, leather or imitation leather envelopes, travel chests, bags, garment bags for travel, trunks, suitcases, luggage, carrying boxes intended for toiletry articles |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | sold empty, rucksacks, handbags, beach bags, reusable shopping bags, shoulder bags, carrying cases, attaché cases, briefcases, school satchels, under-arm bags, wallets, purses, money pouches, key cases, credit card holders; umbrellas, parasols, sun umbrellas, walking sticks in class 018.<br><br>For: clothing, namely, underwear, sweaters, shirts, bodices, corsets, suits, vests, raincoats, skirts, coats, trousers, jumpers, dresses, jackets, shawls, sashes for wear, scarves, neckties, pocket squares, suspenders, gloves, belts, stockings, tights, socks, singlets, bathing suits and bathrobes; footwear; headwear in class 025.<br><br>For: retail store services and online retail store services featuring cosmetics, hair care and skin care preparations, perfumes, shaving preparations, toiletries, smartwatches, computers, tablet computers, computer hardware, computer software, computer peripherals, telephones, mobile electronic devices, health, fitness and exercise sensors, monitors and displays, computer gaming |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | machines and electronic games, and accessories for computers, telephones, and mobile electronic devices, sunglasses, spectacles, optical lenses and glasses, spectacle cases, jewelry and precious stones, watches, clocks, chronometric instruments, accessories for watches and chronometric instruments, leather goods, leatherware, bags, briefcases, luggage, wallets, purses, umbrellas, clothing, footwear, and headgear; public relations; advertising services for luxury products, namely, cosmetics, perfumes, optical goods, telephones, wearable electronic devices, jewelry, horological products, watches, connected watches, smartwatches, luggage, leatherware, bags, clothing, clothing accessories; business management and organization consultancy in the field of luxury goods in class 035. |
| 2,407,950 | TAG HEUER LINK | November 28, 2000 | For: Horological instruments and chronometrical instruments, namely watches, wrist-watches, straps for wrist-watches and watch cases, travel clocks, clocks, chronographs for use as watches, chronometers-- powder compacts and jewel |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | cases in precious metals or coated with precious metals; jewelry made of precious metals or coated with precious metals in class 014. |
| 3,569,070 | HEUER | February 3, 2009 | For: time measuring apparatus and instruments, namely, electronic stop watches, remote control miniprinter timers, electronic and manual timers, photocell timers, starting gate timers, telephone liaison timers, impulse distributor timers, electronic pistol starting timers, manual contactor timers, electric time control switches and their parts; cameras, digital audio players and handheld mobile digital electronic devices for use as a digital audio player, and for use as a camera; accessories for handheld mobile digital electronic devices, namely, cases, batteries, chargers, stands in class 009.<br><br>For: horological and chronometric instruments, namely, watches, watchbands, chronometers, chronographs for use as watches in class 014. |
| 4,868,760 | TAG | December 15, 2015 | For: Timepieces and chronometric instruments in class 014. |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,435,463 | FORMULA 1 | April 7, 1987 | For: Mechanical watches, and their constituent parts in class 014. |
| 3,046,300 | AQUARACER | January 17, 2006 | For: Jewelry, precious stones; timepieces and chronometric instruments, namely watches, watchbands, chronometers, chronographs for use as watches, clocks in class 014. |
| 1,471,988 |  | January 12, 1988 | For: Time measuring instruments, namely, electronic stop watches, remote control mini-printer timers, electronic and manual timers, photocell timers, starting gate timers, telephone liaison timers, impulse distributor timers, electronic pistol starting timers, manual contactor timers in class 009.<br><br>For:  Clocks, watches and parts thereof in class 014.<br><br>For:  Sportswear, namely, parkas in class 025. |
| 2,484,514 |  | September 4, 2001 | For: telephone and parts thereof, optical goods, namely spectacles, sunglasses, spectacle frames, spectacles cases in class 009.<br><br>For: organization of exhibitions for cultural or educational purposes in class 041. |

15. The TAG HEUER Trademarks have been used exclusively and continuously in the U.S. by TAG Heuer, and have never been abandoned. The above U.S. registrations for the TAG HEUER Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 1** are true and correct copies of the United States Registration Certificates for the TAG HEUER Trademarks included in the above table. The registrations for the TAG HEUER Trademarks constitute *prima facie* evidence of their validity and of TAG Heuer's exclusive right to use the TAG HEUER Trademarks pursuant to 15 U.S.C. § 1057(b).

16. The TAG HEUER Trademarks are exclusive to TAG Heuer, and are displayed extensively on TAG Heuer Products and in TAG Heuer's marketing and promotional materials. TAG Heuer Products have long been among the most famous and popular of their kind in the world and have been extensively promoted and advertised at great expense. In fact, TAG Heuer has expended millions of dollars annually in advertising, promoting and marketing featuring the TAG HEUER Trademarks, including in connection with prominent advertising campaigns featuring celebrity spokespersons Uma Thurman, Leonardo DiCaprio, Tiger Woods, Lewis Hamilton, Steve McQueen, and Jeff Gordon. TAG Heuer Products have also been the subject of extensive unsolicited publicity resulting from their high quality and popularity among high profile celebrities and athletes who don TAG Heuer Products at red carpet and athletic events. Because of these and other factors, the TAG Heuer brand and the TAG HEUER Trademarks have become famous throughout the United States.

17. The TAG HEUER Trademarks are distinctive when applied to the TAG Heuer Products, signifying to the purchaser that the products come from TAG Heuer and are manufactured to TAG Heuer's quality standards. All of TAG Heuer's wristwatch products under

the TAG HEUER Trademarks are exclusively manufactured in Switzerland under the stringent quality controls of TAG Heuer, thus ensuring that products bearing the TAG HEUER Trademarks are manufactured to the highest quality standards. The TAG HEUER Trademarks have achieved tremendous fame and recognition, which has only added to the distinctiveness of the marks. As such, the goodwill associated with the TAG HEUER Trademarks is of incalculable and inestimable value to TAG Heuer.

18.     Since at least as early as 2000, TAG Heuer has operated a website where it promotes TAG Heuer Products at tagheuer.com. Sales of TAG Heuer Products at tagheuer.com represent a significant portion of TAG Heuer's business. The tagheuer.com website features proprietary content, images, and designs exclusive to TAG Heuer.

19.     TAG Heuer has expended substantial time, money, and other resources in developing, advertising and otherwise promoting the TAG HEUER Trademarks. As a result, products bearing the TAG HEUER Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high quality products from TAG Heuer. TAG Heuer is a multi-million-dollar operation, and TAG Heuer Products have become among the most popular of their kind in the world.

**Plaintiff Hublot SA**

20.     Plaintiff HUBLOT SA ("Hublot") is organized and existing under the laws of Switzerland with its principal place of business in Nyon, Switzerland.

21.     In 1980, Hublot designed its first case combining natural rubber and gold with a shape inspired by a ship's porthole. When Jean-Claude Biver and Ricardo Guadalupe took the helm of the Hublot brand in 2004, they made this art of fusion into a founding spirit that they deployed as they wished, combining traditional watchmaking savoir-faire with the most cutting-

16

edge technologies and unexpected materials. In 2005, Hublot launched the Big Bang, a revolutionary chronograph and iconic Hublot design that was awarded the "Best Design of the Year" at the Grand Prix d'Horlogerie event in Geneva, Switzerland the year of its debut.

22. Hublot is engaged in the manufacture, sale and distribution of prestigious, high-quality, luxury, mechanical and electronic watches, and other similar items sold throughout the United States (collectively, the "Hublot Products"), all of which prominently display its famous, internationally-recognized and federally-registered trademarks. Hublot Products have become enormously popular and even iconic, driven by Hublot's arduous quality standards and innovative designs. Among the purchasing public, genuine Hublot Products are instantly recognizable as such. In the United States and around the world, the Hublot brand has come to symbolize high quality, and Hublot Products are among the most recognizable of their kind in the world. Hublot is also popular on social media platforms with over 5.2 million Facebook fans, over 686,000 followers on Twitter, and more than 4.8 million followers on Instagram.

23. Hublot has a number of partnerships with high-profile athletic organizations and events worldwide. Hublot was the Official Timekeeper of the 2014 FIFA World Cup in Brazil. Hublot is also the Official Luxury Watch and Timekeeper of the Dallas Cowboys. Additionally, Hublot endorses some of the top football clubs, such as FC Bayern Munich, Juventus, and Paris Saint-Germain, and is a sponsor of the Ferrari Formula One team. Hublot's brand ambassadors also include top U.S. athletes such as Kobe Bryant and Dwayne Wade.

24. Hublot Products are distributed and sold to consumers through boutiques and authorized retailers around the world, throughout the United States and in Illinois, including Geneva Seal in Chicago, Illinois.

25.     Hublot incorporates a variety of distinctive marks in the design of its various Hublot Products.  As a result of its long-standing use, Hublot owns common law trademark rights in its trademarks.  Hublot has also registered its trademarks with the United States Patent and Trademark Office.  Hublot Products typically include at least one of Hublot's registered trademarks.  Often several Hublot marks are displayed on a single product.  Hublot uses its trademarks in connection with the marketing of its Hublot Products, including the following marks which are collectively referred to as the "HUBLOT Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,222,529 | HUBLOT | January 4, 1983 | For: Watches and Clocks and Parts Therefor; Chronometers; Chronographs; Costume Jewelry and Jewelry Made Wholly or in Part of Precious Metals in class 014. |
| 3,405,702 | HUBLOT | April 1, 2008 | For:  Sunglasses, sports eyewear, spectacle frames, spectacle cases in class 009.<br><br>For: Pencil stands, propelling pencils, roller pens, penholders and pen clips, pens, pen nibs, pen cases, writing materials, namely, inks and pads in class 016.<br><br>For: Rucksacks, handbags, traveling bags, trunks and suitcases, boxes and cases of leather or imitation leather, valises for personal effects, attache cases, traveling bag sets, briefcases, key cases, business card cases, umbrellas, parasols and walking sticks in class 018. |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 3,661,145 | HUBLOT | July 28, 2009 | For: Clothing, namely, tee-shirts, shirts, jerseys, pullovers, skirts, trousers, jackets, suits, coats, sashes for wear, ties; footwear, headwear, namely, hats and caps in class 025.<br><br>For: Tobacco; matches and smokers' articles not made of precious metals, namely, smokers' ashtrays, cigar and cigarette boxes, smokers' lighters, smokers' ashtrays in class 034. |
| 4,702,607 | HUBLOT | March 17, 2015 | For: perfumes, non-medicinal preparations for toiletry use, namely, oils, after shave lotions and soaps; cosmetics in class 003. |
| 3,787,659 | UNICO | May 11, 2010 | For: Movements for clocks and watches in class 014. |
| 3,083,092 | BLACK MAGIC | April 18, 2006 | For: Jewellery; timepieces and chronometric instruments namely watches used as chronographs, watches used as chronoscopes, chronometers, watches, wristwatches, jewellery watches, diving watches in class 014. |
| 3,149,003 | BIG BANG | September 26, 2006 | For: Timepieces and chronometric instruments and parts thereof namely watch cases, watch bands, watches used as chronographs, watches used as chronoscopes, |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | chronometers, watches, wristwatches, dress watches, diving watches, movements for clocks and watches, movements for watches in class 014. |
| 3,376,234 | BIG BANG | January 29, 2008 | For: Sunglasses, sports eyewear, spectacle frames, spectacle cases in class 009. |
| 3,814,806 | KING POWER | July 6, 2010 | For: Jewelry; horological and chronometric instruments, namely, watches, wristwatches, watch bands, dials, clocks, wall clocks, chronometers, chronographs in class 014. |
| 4,140,869 | KEY OF TIME | May 15, 2012 | For: Jewelry, timepieces and chronometric instruments, namely, watches, wristwatches, watch bands, watch cases, dials, clocks, wall clocks, chronometers, chronographs in class 014. |
| 4,381,674 | MAGIC GOLD | August 13, 2013 | For: Gold-based alloys and composites thereof and goods made of the aforesaid materials, namely, watches, wristwatches, watch straps, dials for clocks- and watch-making, chronometers, and chronographs for use as timepieces, all the foregoing containing gold in class 014. |
| 4,779,597 | FIRMAMENT | July 28, 2015 | For: Timepieces and chronometric instruments, namely, watches, wristwatches, chronometers, clocks, table clocks, movements for timepieces; jewelry, namely, bracelets, rings, necklaces, |

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| | | | earrings, pendants, brooches, cufflinks in class 014. |
| 3,715,561 |  | November 24, 2009 | For: Jewellery; horological and chronometric instruments, namely, watches, wristwatches, watchbands, watch cases, dials, clocks, wall clocks, chronometers, chronographs in class 014. |
| 4,916,069 |  | March 15, 2016 | For: Jewelry, timepieces and chronometric instruments, namely, watches, wristwatches, watch straps, watch cases, dials for clock-and watch making, clocks, wall clocks, chronometers and chronographs as watches in class 014. |

26.    The HUBLOT Trademarks have been used exclusively and continuously in the U.S. by Hublot, and have never been abandoned.  The above U.S. registrations for the HUBLOT Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 2** are true and correct copies of the United States Registration Certificates for the HUBLOT Trademarks included in the above table.   The registrations for the HUBLOT Trademarks constitute *prima facie* evidence of their validity and of Hublot's exclusive right to use the HUBLOT Trademarks pursuant to 15 U.S.C. § 1057(b).

27.    The HUBLOT Trademarks are exclusive to Hublot, and are displayed extensively on Hublot Products and in Hublot's marketing and promotional materials.  Hublot Products have long been among the most famous and popular of their kind in the world and have been extensively promoted and advertised at great expense.  In fact, Hublot has expended millions of

dollars annually in advertising, promoting and marketing featuring the HUBLOT Trademarks. Hublot Products have also been the subject of extensive unsolicited publicity resulting from their high quality and popularity among high profile celebrities and athletes who don Hublot Products at red carpet events and athletic events. Because of these and other factors, the Hublot brand and the HUBLOT Trademarks have become famous throughout the United States.

28. The HUBLOT Trademarks are distinctive when applied to the Hublot Products, signifying to the purchaser that the products come from Hublot and are manufactured to Hublot's quality standards. Whether Hublot manufactures the products itself or licenses others to do so, Hublot has ensured that products bearing its trademarks are manufactured to the highest quality standards. The HUBLOT Trademarks have achieved tremendous fame and recognition, which has only added to the distinctiveness of the marks. As such, the goodwill associated with the HUBLOT Trademarks is of incalculable and inestimable value to Hublot.

29. Since at least as early as 2006, Hublot has operated a website where it promotes Hublot Products at hublot.com. The hublot.com website features proprietary content, images, and designs exclusive to Hublot.

30. Hublot has expended substantial time, money, and other resources in developing, advertising and otherwise promoting the HUBLOT Trademarks. As a result, products bearing the HUBLOT Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high quality products from Hublot. Hublot is a multi-million-dollar operation, and Hublot Products have become among the most popular of their kind in the world.

31. The TAG HEUER Trademarks and the HUBLOT Trademarks are collectively referred to herein as "Plaintiffs' Trademarks."

22

32.     The TAG Heuer Products and the Hublot Products are collectively referred to herein as "Plaintiffs' Products."

**The Defendants**

33.     Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiffs.  On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions with lax trademark enforcement systems, or redistribute products from the same or similar sources in those locations.  Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

34.     On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto.  Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their counterfeit network.  If Defendants provide additional credible information regarding their identities, Plaintiffs will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

35.     The success of Plaintiffs' respective brands has resulted in their significant counterfeiting.  Consequently, Plaintiffs have a worldwide anti-counterfeiting program and regularly investigate suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers.  In recent years, Plaintiffs have identified numerous fully interactive e-commerce stores, including those operating under the Seller Aliases, which were offering for sale and/or selling Counterfeit Products to consumers in this Judicial District and throughout the

United States. E-commerce sales, including through e-commerce stores like those of Defendants, have resulted in a sharp increase in the shipment of unauthorized products into the United States. **Exhibit 3**, Excerpts from Fiscal Year 2018 U.S. Customs and Border Protection ("CBP") Intellectual Property Seizure Statistics Report. Over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). *Id*. Over 85% of CBP seizures originated from mainland China and Hong Kong. *Id*. Counterfeit and pirated products account for billions in economic losses, resulting in tens of thousands of lost jobs for legitimate businesses and broader economic losses, including lost tax revenue.

36.     Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 4**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); see also, report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 5** and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. **Exhibit 5** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and

operated.  **Exhibit 5** at p. 39.  Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 4** at 186-187.

37.    Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold Counterfeit Products to residents of Illinois.

38.    Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies.  For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers.  E-commerce stores operating under the Seller Aliases look sophisticated and accept payment in U.S. dollars via credit cards, Alipay, Amazon Pay, Western Union and/or PayPal.  E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer.  Plaintiffs have not licensed or authorized Defendants to use any of the Plaintiffs' Trademarks, and none of the Defendants are authorized retailers of genuine Plaintiffs' Products.

39.    Many Defendants also deceive unknowing consumers by using Plaintiffs' Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Products.  Other e-commerce stores operating under the Seller Aliases omit using Plaintiffs' Trademarks in the item title to evade enforcement efforts

while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiffs' Products.

40.     On information and belief, Defendants have engaged in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms.   On information and belief, certain Defendants have anonymously registered and maintained Seller Aliases to prevent discovery of their true identities and the scope of their e-commerce operation.

41.     On information and belief, Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products.   Such seller alias registration patterns are one of many common tactics used by the Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

42.     Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use.   E-commerce stores operating under the Seller Aliases include other notable common features, such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, illegitimate search engine optimization (SEO), advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Counterfeit Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.

26

43. On information and belief, Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn, kaidianyo.com and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

44. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Plaintiffs' enforcement efforts. On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore bank accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiffs. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

45. On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiffs, have jointly and severally, knowingly and willfully used and continue to use Plaintiffs' Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States and Illinois over the Internet.

46. Defendants' unauthorized use of Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including the sale of Counterfeit Products into the United States, including Illinois, is likely to cause and has caused

27

confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

47. Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

48. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiffs' Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Plaintiffs' Products offered, sold or marketed under Plaintiffs' Trademarks.

49. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiffs' Trademarks without Plaintiffs' permission.

50. Plaintiffs are the exclusive owners of their respective Plaintiffs' Trademarks. Plaintiffs' United States Registrations for their respective Plaintiffs' Trademarks (Exhibits 1-2) are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiffs' rights in Plaintiffs' Trademarks, and are willfully infringing and intentionally using counterfeits of Plaintiffs' Trademarks. Defendants' willful, intentional and unauthorized use of Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

51. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

52.     Plaintiffs have no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the goodwill of Plaintiffs' Trademarks.

53.     The injuries and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Products.

**COUNT II**
**FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))**

54.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

55.     Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiffs or the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

56.     By using Plaintiffs' Trademarks in connection with the sale of Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

57.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

58.     Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the associated goodwill of Plaintiffs' respective brands.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using Plaintiffs' Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Plaintiffs' Product or is not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Plaintiffs' Product or any other product produced by Plaintiffs, that is not Plaintiffs' or not produced under the authorization, control, or supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise connected with Plaintiffs;

   d. further infringing Plaintiffs' Trademarks and damaging Plaintiffs' goodwill; and

   e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any of Plaintiffs' trademarks,

including the Plaintiffs' Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

2) Entry of an Order that, at Plaintiffs' choosing, the registrant of the Domain Names shall be changed from the current registrant to Plaintiffs, and that the domain name registries for the Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Domain Names to a registrar of Plaintiffs' selection, and that the domain name registrars, including, but not limited to, GoDaddy Operating Company, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), and Namecheap Inc. ("Namecheap") shall take any steps necessary to transfer the Domain Names to a registrar account of Plaintiffs' selection; or that the same domain name registries shall disable the Domain Names and make them inactive and untransferable;

3) Entry of an Order that, upon Plaintiffs' request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Wish.com, and Dhgate (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Plaintiffs' Trademarks;

4) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiffs be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiffs' Trademarks;

6) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

Dated this 1st day of December 2020.  Respectfully submitted,

            /s/ Justin R. Gaudio
            Amy C. Ziegler
            Justin R. Gaudio
            Allyson M. Martin
            Abby M. Neu
            Greer, Burns & Crain, Ltd.
            300 South Wacker Drive, Suite 2500
            Chicago, Illinois 60606
            312.360.0080
            312.360.9315 (facsimile)
            aziegler@gbc.law
            jgaudio@gbc.law
            amartin@gbc.law
            aneu@gbc.law

            *Counsel for Plaintiffs*
            *LVMH Swiss Manufactures SA and Hublot SA*